**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| SCOTT A. SHELL, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:11-CV-301-PRC |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Scott A. Shell on August 31, 2011, and an Opening Brief of Plaintiff in Social Security Appeal [DE 21], filed by Plaintiff on May 1, 2012. Plaintiff requests that the June 25, 2010 decision of the Administrative Law Judge denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") be reversed or remanded for further proceedings. On August 13, 2012, the Commissioner filed a response, and Plaintiff filed a reply on September 17, 2012. For the following reasons, the Court grants the relief sought by Plaintiff and remands this matter for further proceedings.

## PROCEDURAL BACKGROUND

On December 29, 2008, Plaintiff filed applications for DIB and SSI, alleging an onset date of December 29, 2008. His applications were denied initially on July 6, 2009, and upon reconsideration on September 4, 2009. On October 15, 2009, Plaintiff filed a timely request for hearing. The hearing was held on June 8, 2010, in Ft. Wayne, Indiana, before Administrative Law Judge ("ALJ") David K. Gatto, by video teleconference. In appearance were Plaintiff, his attorney Joseph W. Shull, his mother Debra Resendez, and vocational expert ("VE") Jeff Goldfarb. On June

25, 2010, the ALJ issued a decision finding that Plaintiff was not disabled under the Social Security

Act. The ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.     The claimant has not engaged in substantial gainful activity since December 29, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.     The claimant has the following severe impairments: depressive disorder, not otherwise specified/major depressive disorder; anxiety disorder, not otherwise specified; alcohol dependence; amnestic disorder status post brain trauma; status post arthroplasty of the left foot toes 1-4; status post amputation of second toe, third toe, fifth toe, and great toe of left foot; complex regional pain syndrome of bilateral lower extremities; and status post skin grafting (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform unskilled sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a).

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born [in 1977] and was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 29, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

AR 41-51.

On June 27, 2011, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. Plaintiff filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g). On September 6, 2012, this case was reassigned to the undersigned Magistrate Judge.

## FACTS

### A. Background

Mr. Shell was 29 years old at his alleged onset. He has a high school education. His past relevant work was as a cook and a line operator.

## B. Medical Background

*1.    Mental Impairments*

a.    Parkview Behavioral Hospital

On December 25, 2008, Mr. Shell was involuntarily committed at the request of his mother and grandfather due to his erratic behavior and suicide threats. On admission, testing showed a blood alcohol level of 0.35. In a psychiatric evaluation dated December 26, 2008, Mr. Shell reported that he was receiving unemployment benefits, which was what helped him get through school. He was transferred to the care of Park Center on January 2, 2009, and he was seen by Dr. Lambertson, Dr. Surakanti, and Dr. Don Marshall. During the few days that Dr. Lambertson followed Mr. Shell, Mr. Shell's mood was bright, and there was no evidence of depression. Mr. Shell continued to deny any suicidal ideation. Dr. Lambertson noted a long history of problems with underlying anxiety. On January 5, 2009, Dr. Lambertson found that it was reasonable to release Mr. Shell as he was not showing any evidence of underlying depression. His discharge diagnosis included alcohol dependence, continuous and severe; substance induced mood disorder, resolved; and anxiety disorder, NOS. His Global Assessment of Functioning ("GAF") on admission was 10-15 and 55-60 on discharge.

b.    Park Center Inc.

On January 20, 2009, Brenda Smith, a social worker with Park Center, Inc., performed a case management individual assessment. Mr. Shell reported that his family is involved but not emotionally supportive, people outside of the family are occasionally supportive, he makes friends and maintains relationships, and he did not want his mother involved in treatment. He reported some problems in the work environment involving attendance, productivity, and poor relationships

with others. He was not employed at that time, but he had held jobs for reasonable periods of time, and he was attending college full time. In the mental status domain the following conditions were found to exist: agitation, poor judgment, minimal insight, denial of problems, anxious and angry mood, suspicious and blaming thought content, mild disruptions in thought processes or content, mild problems with impulse control, agitated when confronted with a problem, difficulty choosing appropriate alternatives when making decisions, mild to moderate problems with decision-making, mild phobia or anxiety problem, trouble sleeping, and mild depression.

Mr. Shell reported that he was able to stay on task and did not have any trouble moving from one activity to another. It was noted that his moderate to severe anger control problems created significant problems within family, school, and work. There was evidence of a moderate degree of interpersonal problems. He needed a little more drugs/alcohol to get high, and he had missed an important obligation because of getting high or getting over the effects of being high. He was found to have a moderate substance use problem that required treatment. The diagnosis was Depressive Disorder, NOS, alcohol dependence, and anxiety disorder, NOS. His then-current GAF was 61.

Mr. Shell saw Karen Lothamer, a psychiatric nurse, on February 2, 2009. On a mental status exam he was positive for a flight of ideas. He was found to be fully compliant in his medications and much better. He was seen again by Ms. Lothamer on March 30, 2009. On a mental status exam positive signs included the following: depressed and anxious mood. He was fully compliant with his medications; he was symptomatic but stable.

In May 2009, James White, a service coordinator, and Dr. Larry Lambertson, a psychiatrist, completed a "Report of Psychiatric Status" at the request of Social Security. Dr. Lambertson noted the current diagnosis of depressive disorder, NOS, alcohol dependent, and anxiety disorder. At the

time, Mr. Shell's GAF was 50, and his highest GAF for the previous year was 55. Mr. Shell reported having problems from a mental standpoint after graduating from high school. His family physician had started him on Prozac. Mr. Shell said that his mental difficulties came to a head around August of 2007 when he was working as a cook in an Italian restaurant. He had tried unsuccessfully to get a job at many different places since 2007, and he reported that he was mainly told that he was either not qualified or that he was over-qualified. His past treatment included seeing Dr. P. Rustagi, a psychiatrist, in 1996; treatment at Lindenview Hospital in 1998; treatment at Charter Beacon hospital in 2001; treatment at Parkview Behavioral Health in 2008 and 2009; and treatment at Park Center from August of 1998 to October of 1998, August 2001 to January 2002, August 2008, and December of 2008 to the date of the report. It was observed that Mr. Shell was somewhat emotional in his presentation, his mood and affect at times appeared to be tearful, he had an emotionally sad face during the interview, and he spent a lot of time staring at the floor.

In regard to current specific manifestations of Mr. Shell's mental disorder, it was noted that he talked with "utter despair" about alienating himself and becoming quite aloof, not understanding why he just cried for no emotional reason, and then finding himself in an alcoholic stupor, not knowing that depression and alcoholism go hand-in-hand. Mr. Shell reported that he does not spend significant time with family and friends and remains aloof from everyone. He does not like to feel that way, but if it were not for his physical therapy and almost daily doctor appointments, he would not have much to do. He was able to give the number of random digits four forward and four backward. When asked to recall three items after five minutes, he could only recall one. Mr. Shell reported that his short-term memory was not bad before he was hospitalized, but since then, he definitely has difficulty with his short-term memory especially in regard to remembering things that

were just told to him. He cited the example of when he was reporting back the numbers stating that was very difficult for him. He was able to perform simple calculations. He had some problems with serial 7's as he sometimes forgot the last number.

Mr. Shell reported that he does not do much because of his physical impairment and that he spends quite a bit of time being reclusive in his room watching television but not really paying attention to what was going on. He reported that he was oftentimes lonely, and he got depressed. However, the medications have helped him. Mr. Shell reported that he has a very weak and limited social support with his family. He lived with his grandfather, and his grandfather helped him with some of his activities of daily living due to his limited mobility. He reported that he does not have any friends as far as neighbors are concerned, and he speaks to the few friends he has every now and then. He did not believe that he had any problems relating to his friends, with whom his relationships were fairly superficial. He said that he does not have a problem with constructive criticism.

Mr. White and Dr. Lambertson found that, due to Mr. Shell's inability to concentrate and his problems with short-term memory, it would be difficult for him to work. Mr. Shell reported that he goes through a daily ritual of feeling depressed, not feeling motivated, and being in a lot of pain. He struggled with depression, but he was willing to try therapy. Mr. White and Dr. Lambertson thought it was not advisable at that time for him to enter the workforce because that would cause added stress on him.

On May 29, 2009, Mr. Shell saw Ms. Lothamer. On a mental status exam he was positive for the following: a depressed mood and flat affect. He was fully compliant with medications and was maintaining well and stable.

On August 10, 2009, Ms. Lothamer saw him again for pharmacological management, and Mr. Shell's mother was present. His mother was concerned about his ability to work, his list of medications, and his diagnosis. His mother accused Ms. Lothamer of telling other Park Center staff that she declined to complete a letter saying that he could not work, and his mother clarified that medically he was not able to work. Ms. Lothamer felt that his medical doctor should write a letter regarding that issue. Positive signs on a mental status exam included the following: depressed and anxious mood, distractible behavior, and flat affect. He was fully compliant with medication treatment. As for the correlation between medication and course of illness, he was symptomatic but stable. Remeron and Klonopin medications were added, and Ativan was discontinued.

On August 21, 2009, Mr. Shell saw Dr. Vijoy Varma for pharmacological management. On mental status exam Dr. Varma found the following positive signs: depressed and anxious mood, poor grooming, needy and critical attitude, and distractible behavior. Mr. Shell was fully compliant with medications; he was symptomatic but stable.

On August 24, 2009, Mr. Shell's treatment plan was reviewed, and his diagnosis was the same with a GAF of 61. It was noted that he would like to have someone to talk to and work through his anxiety and depression issues along with PTSD, and he was assigned for counseling. Another treatment plan and review was done on September 8, 2009, and Mr. Shell's diagnosis and his GAF remained the same. On September 10, 2009, he saw Andrew Liechty for counseling; on a mental status exam there were no positive signs.

Mr. Shell was seen by Dr. Varma again on September 21, 2009. On a mental status exam the following positive signs were found: intrusive, needy, and critical attitude, overactive and

distractible behavior, and circumstantial thought. He was fully compliant with medications; he was maintaining well and stable.

Mr. Shell was seen again by Mr. Liechty on October 2, 2009; on a mental status exam he had the following positive findings: elevated mood, pressured speech, and restless behavior. He saw Mr. Liechty a few days later in October; on a mental status exam he showed the following positive signs: a flight of ideas.

On December 16, 2009, Mr. Shell saw Dr. Varma. Dr. Varma noted that Mr. Shell had gone without Zoloft for two days and felt much worse. On a mental status exam, Mr. Shell had the following positive signs: anxious mood and pressured speech. Dr. Varma noted that Mr. Shell's behavior was under fair control and his attitude was much better than at the last appointment. He was fully compliant with medications, and he was much better.

On February 17, 2010, Mr. Shell saw Dr. Varma, who found a negative mental status exam. Dr. Varma noted that Mr. Shell was enormously better than before and fully compliant with medications. He found that Mr. Shell was maintaining well and stable.

On March 3, 2010, Mr. Shell's mother called and talked to Susan Didion. Mr. Shell's mother reported that her son was having difficulty with mood swings, irritability, and difficulty falling and staying asleep. She reported that he was "snapping people's heads off," and that it did not take much for him to explode. AR 894. His mother wanted him to go back to therapy, but she was told that he had declined further therapy services when his therapist left. Dr. Varma was notified of these things, and he increased his Remeron and added Abilify. Mr. Shell's mother also thought that he may not have been taking his medications.

On April 22, 2010, Dr. Varma completed a "Mental Impairment Questionnaire." He noted that he had reviewed the consultative exam of Dr. Huang and the Mental Residual Functional Capacity Evaluation of July 3, 2009. His diagnosis was Depressive Disorder, NOS; alcohol dependence; anxiety disorder, NOS. He found that Mr. Shell's then-current GAF was 45 and that his highest GAF over the previous year was also 45. Dr. Varma identified the following signs and symptoms associated with the diagnosis: Mood disturbance; decreased energy; generalized persistent anxiety; social withdrawal or isolation; blunt, flat, or inappropriate affect; substance dependence; and suicidal ideation or attempts. At that time, Mr. Shell's medications were Zoloft, Invega, Ambien, Klonopin, and Buspar. Dr. Varma's prognosis was guarded. He found that Mr. Shell would miss work more than three days per month due to his mental conditions. Finally, he found that the improvement of Mr. Shell's mental functioning with treatment was taken into account in assigning the limitations.

c.      Dr. Rosalind Huang

Rosalind Huang, Psy.D. performed a psychological evaluation of Mr. Shell on June 29, 2009, on behalf of the disability determination bureau. She found that, during the evaluation, his comprehension and concentration were weak and his memory was poor. He was able to repeat 5 digits forward and 3 digits backward. Although he was able to do simple calculations, he could say the name of the current president but not the previous one. She found that his immediate memory was weak and that his short-term memory skills were fragmented. He was living with his grandfather who did the cooking and the grocery shopping. Dr. Huang administered the Wechsler Memory Scale III to Mr. Shell. The test results indicated significant problems with intermediate and short term memory. Dr. Huang found that it would be very likely that these memory problems would interfere

with adequate vocational functioning, and Mr. Shell would have difficulty remembering information that was presented earlier. She noted that Mr. Shell is usually dependent on his grandfather to remind him of doctors' appointments. On mental status exam the most pronounced psychiatric symptoms appeared to be depression and anxiety. Her diagnosis included amnestic disorder due to brain trauma; major depressive disorder, single episode, severe; and anxiety disorder, NOS. She rated his current GAF at 50.

d.      Drs. Hill and Unversaw

Stacia Hill, Ph.D completed a Psychiatric Review Technique form on July 3, 2009. Dr. Hill found that Mr. Shell had affective disorders, anxiety-related disorders, and substance addiction disorders. Under "organic mental disorders," Dr. Hill listed his medically determinable impairment as "amnesic [disorder] due to brain trauma." (AR 661). She found that he had a moderate degree of limitation in his ability to maintain concentration, persistence, or pace. She found only a mild degree of limitation in daily living activities and in maintaining social functioning and no episodes of decompensation. Dr. Hill also completed a Mental Residual Functional Capacity Assessment that same date. In the section on "Summary Conclusions," Dr. Hill found that the following abilities were "moderately limited": to understand and remember detailed instructions; to carry out detailed instructions; and to maintain attention and concentration for extended periods. Dr. Hill found that Mr. Shell would be unable to complete complex tasks, but he would be able to complete "repetitive tasks" on a sustained basis without special considerations. (AR 677).

2.    *Physical Impairments*

a.    Hospitalization

On February 22, 2009, Mr. Shell was found outside in the elements for an undetermined period of time, apparently hanging from a picket fence by his jeans, which caused strangulation injury to his left leg. Upon arrival at St. Joseph Hospital, where he was hospitalized from February 22, 2009, through March 16, 2009, Mr. Shell was profoundly hypothermic with a body temperature of 27.3 degrees centigrade and a pulse that was profoundly bradycardic in association with relatively low blood pressure, unresponsive stage. The doctors were able to salvage his left lower extremity. His rhabdomyolysis slowly clinically resolved. His encephalopathy, delirium, gastroparesis, and numerous electrolyte disturbances were slow to respond, but they trended in the correct direction. He clinically improved with all of these interventions, and he was successfully weaned and extubated from mechanical ventilation with persistence of delirium. Mr. Shell required significant analgesia sedation regimen during his early hospital phase in relation to his polysubstance drug use. His clinical condition improved, but he did sustain some distal neuropathic injury consistent with femoral nerve, peroneal nerve dysfunction/injury. He underwent surgery. With physical therapy and occupational therapy he clinically improved with the capacity to feed himself and with clearance of his encephalopathy.

b.    Treating Physician Dr. Jonathan Norton

On May 22, 2009, Dr. Norton, DPM performed a surgery to amputate toes on Mr. Shell's left foot. On July 2, 2009, Dr. Norton responded to Mr. Shell's question regarding work by stating that Mr. Shell should be able to do desk work or a seated type of job. On July 10, 2009, Dr. Norton stated that Mr. Shell needed to elevate his feet for 10 to 15 minutes for every two hours of work. On

November 20, 1999, Dr. Norton performed an additional toe amputation surgery on Mr. Shell's left foot. Dr. Norton saw Mr. Shell on the following dates: March 22, 2009; April 17, 2009; April 26, 2009; May 15, 2009; June 19, 2009; June 26, 2009; September 9, 2009; September 18, 2009; October 2, 2009; October 16, 2009; October 30, 2009; December 4, 2009.

c.     Dr. Kevin Berning

Dr. Berning and Dr. Stephens saw Mr. Shell on the following dates after his hospitalization at St. Joseph: March 13, 2009; March 16, 2009; March 23, 2009; April 6, 2009; April 13, 2009; April 27, 2009. They were generally satisfied with the results.

On July 2, 2009, Mr. Shell saw Dr. Berning for evaluation of his left foot, a week after undergoing amputation of the distal half of the second toe. Mr. Shell reported that he had been doing well, had no problems with the foot, and had no pain or discomfort.

In a July 24, 2009 letter written at the request of the Disability Determination Bureau, Dr. Berning wrote that Mr. Shell "can perform any job. In reference to his feet, Dr. Berning stated that he can perform any sitting, standing job, he can do any walking. He can lift heavy objects, speak, and hear. Dr. Berning stated that Mr. Shell really has no "functional impairment to do any type of work in reference to his feet." AR 745. Dr. Berning went on to write that he "would recommend more of a seated job for him due to the fact that he does have some neuropathy but that is not a complete requirement." *Id*. The letter indicated that the dates of admission were July 7, 2009, through July 17, 2009.

d.     Dr. Bhupendra K. Shah

Dr. Shah, a neurologist, first saw Mr. Shell on April 6, 2009, for what his patient described

as a problem with his left leg and a dead spot in the muscle in that leg. Mr. Shell reported some tingling involving his legs, and he was not able to put weight on his left leg. He continued to have some left-sided foot drop. On physical exam he had some weakness of the left leg as well as left foot drop with some hypo-reflexia in the legs. Dr. Shah ordered an EMG, which was performed on June 1, 2009, and was abnormal. The EMG showed changes suggestive of a moderate degree of peripheral neuropathy as well as changes of denervation involving the tibialis anterior and the gastroc muscle which would go along with lumbosacral plexopathy involving the left leg. Mr. Shell saw Dr. Shah again on July 27, 2009.

e.      Dr. Anuradha Kollipara

On April 9, 2009, Mr. Shell first saw Dr. Kollipara because he needed a family physician and medication management. Dr. Kollipara noted among other things that Mr. Shell reported having short term memory deficits. Mr. Shell was seen again on April 23, 2009, because he had run out of Vicodin and took Methadone when that happened; as a result, he needed both. He was seen again on May 7, 2009, for severe pain, reporting that the Methadone and Vicodin were not effective and that he was unable to get out of bed on some days. Mr. Shell saw Dr. Kollipara again on August 3, 2009, on August 27, 2009, to fill out a social security disability form, and on September 24, 2007, for a cold. At the last two exams, Dr. Kollipara noted edema in the left leg.

f.      Dr. William Hedrick

Dr. Hedrick first saw Mr. Shell on June 10, 2009, for an evaluation. Mr. Shell reported that his primary pain location was his left leg. He reported that the pain was an 8 on a 1-to-10 scale at that time and that his pain does get as bad as 10. He described the pain as stabbing, burning, and aching. His pain was worse at night, and it was decreased by elevating the leg and medications. The

pain was aggravated by prolonged standing and walking. On physical exam all tests on the lumbar spine and sacroiliac joints were normal. In the extremities there were scars from previous frostbite injury and skin graft. The left hallux and left 5th toe inspection revealed partial amputation. From a neurological standpoint the S1 dermatome, L4 dermatome, and L5 dermatome demonstrated decreased light touch sensation, and his gait was slow with shuffle and short steps. He used a cane for support. His diagnosis was a history of traumatic compartment syndrome left lower extremity; history of frostbite injury bilateral feet; neuropathic pain; depression; anxiety; personality disorder; management of high risk medications; and history of osteomyelitis and amputated left 1st and 5th toes. Dr. Hedrick switched his medications to MS ER and Percocet from Methadone due to other medication that he was taking regularly for psychological conditions.

Mr. Shell saw Dr. Hedrick again on July 22, 2009, and he reported that his pain was not well controlled after the recent surgery. The MS ER was increased. Medication was also added for breakthrough pain. Mr. Shell was seen again on September 2, 2009. He reported that his pain was constant throughout the day with varying levels of severity. The pain was decreased by nothing. There was no change in his medication regimen. On October 14, 2009, Mr. Shell was seen again and reported that the pain was decreased by nothing, still describing his pain as stabbing, throbbing, occasionally sharp and constant throughout the day with varying levels of severity.

On November 11, 2009, Mr. Shell reported that the pain was decreased by nothing. On December 9, 2009 (earlier than normal because he was going to a funeral in Florida and had to do so to avoid running out of medication), Mr. Shell again reported that his pain is constant throughout the day with varying levels of severity and was decreased by nothing. He was seen again on December 30, 2009, and reported that his pain was constant throughout the day with varying levels

of severity, and it was decreased by nothing.  He was seen on February 4, 2010, and he had run out

of medications the previous day because the original appointment was two days earlier.  He reported

his pain as constant throughout the day with varying levels of severity, and it was decreased by

nothing.  He was seen a month later on March 4, 2010, and he reported that his pain was currently

well controlled with the increase in the MS ER, which he reported had been helpful and that his pain

at that time was well controlled.

On June 3, 2010, Dr. Hedrick completed a Medical Source Statement.  Dr. Hedrick noted

that Mr. Shell's prognosis was poor.  He found that Mr. Shell had sharp pain from the knee to the

foot and in the left lateral foot. Elevation and rest were helpful to relieving the pain. Dr. Hedrick

found that emotional and/or psychological factors contributed to the severity of Mr. Shell's

symptoms and functional limitations. He found that Mr. Shell could work only on a part-time basis

about 4 hours per day. He found that Mr. Shell should elevate his leg above the heart for about 12%

of the workday due to swelling with dependency. Finally, he found that Mr. Shell would miss more

than three days of work per month due to his pain.

g.      Dr. R. Fife

Dr. Fife, a disability determination bureau reviewer, reviewed all the evidence in the file and

affirmed the decision of July 6, 2009, as written. Dr. Fife reviewed the file due to additional

evidence received on September 3, 2009, and again affirmed the previous decision.[1]

## C.  Mr. Shell's Testimony

Mr. Shell testified that he has many different pain levels in his leg, that he elevates it

constantly, and that he walks with a cane. He felt that he was not getting better, even though the

---

[1] Plaintiff asserts that the July 2009 state agency decision appears to be missing from the file. *See* Pl. Br., p. 15. However, the July 2009 decision is at pages 60 and 64 of the administrative record.

accident had been a year and four months earlier. He testified that the doctors could not get his medications adjusted correctly. He spends a lot of time in bed resting, elevating the leg because of constant swelling. He has to interrupt activities to elevate his leg due to swelling. He was not sleeping well. Although he was taking morphine three times a day, which helped with most of the pain, it did not help with the "shocking nerve pains." (AR 17).When he elevates his leg, it must be chest high. Mr. Shell testified that he gets anxious and secludes himself. He testified that his pain fluctuates daily, like a roller coaster.

### D. Mr. Shell's Mother's Testimony

Mr. Shell's mother Mrs. Recendes testified that there was an extreme change in Mr. Shell's mental condition after the accident. He is irritable, anxious, and does not remember things. She testified that Mr. Shell's grandfather noted that Mr. Shell's memory was poor.

### E. Vocational Expert Testimony

The ALJ asked the Vocational Expert to consider a hypothetical individual who was the same age as Plaintiff and who had the same educational background. The ALJ limited the individual to unskilled sedentary work. The Vocational Expert testified that such an individual could perform work as a table worker (approximately 1,100 positions in the state of Indiana) and a charge account clerk (800 positions).

### STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an

erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that, as a reviewing

court, we may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled,

and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's RFC, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC"). The RFC "is an administrative assessment of what work-related activities an individual can perform despite [his] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Mr. Shell seeks remand on three bases: (1) the ALJ improperly evaluated the opinions of several doctors, including treating psychiatrist Dr. Vijay Varma, consultative examiner Dr. R. Huang, treating physician Dr. Jonathan Norton, and treating physician Dr. William Hedrick; (2) the ALJ failed to properly incorporate his finding of a moderate degree of limitation in concentration, persistence, or pace in his hypothetical; and (3) the ALJ improperly evaluated the credibility of Mr. Shell. The Court considers each proposed basis for remand in turn.

## A. Weight Given to Doctors' Opinions

Mr. Shell raises issues with the weight the ALJ gave several of his treating, examining, and reviewing doctors. In response, the Commissioner argues that Mr. Shell's disagreement with the ALJ's evaluation of the opinions is nothing more than an attempt to have the Court reweigh the evidence. The Court disagrees. An ALJ must give the medical opinion of a treating doctor controlling weight as long as the

> treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record . . . .  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion.  We will always give good reasons . . . for the weight we give to your treating source's opinion.

20 C.F.R. § 404.1527(c)(2); 20 C.F.R. § 416.927(c)(2); *see also Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); SSR 96-8p; SSR 96-2p, 1996 WL 374188 (Jul. 2, 1996).  In other words, the ALJ must give a treating physician's opinion controlling weight if (1) the opinion is supported by "medically acceptable clinical and laboratory diagnostic techniques" and (2) it is "not inconsistent" with substantial evidence of record."  *Schaaf*, 602 F.3d at 875.

The referenced factors listed in paragraphs (c)(2)(i) through (c)(6) are the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and other factors such as the familiarity of a medical source with the case.  20 C.F.R. §§ 404.1527(c), 416.927(c). "[I]f the treating source's opinion passes muster under [§ 404.1527(c)(2)], then there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it." *Punzio v. Astrue*, 630 F.3d 704, 713

(7th Cir. 2011) (internal quotation marks omitted) (quoting *Hofslien*, 439 F.3d at 376). Courts have acknowledged that a treating physician is likely to develop a rapport with his or her patient and may be more likely to assist that patient in obtaining benefits. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). An ALJ is entitled to discount the medical opinion of a treating physician if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as the ALJ gives a good reason. *Schaaf*, 602 F.3d at 875; *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).

1.    *Dr. Varma–Treating Psychiatrist*

Mr. Shell was treated by Dr. Varma and the rest of Mr. Shell's "team" at Park Center Inc. (namely Karen Lothamer, Dr. Lambertson, Susan Didion, Andrew Liechty, Bambi Rowan, and Scott Lee). On April 22, 2010, Dr. Varma opined on a Mental Impairment Questionnaire that Mr. Shell would miss greater than three days of work per month. At the hearing, the VE testified that an individual who missed that much work would not be able to perform any competitive work on a sustained basis.

In his decision, the ALJ stated that he gave little weight to this opinion of Dr. Varma because it was inconsistent with his own treatment notes and with the record as a whole. Without offering specific examples, the ALJ explained that Dr. Varma's treatment notes indicate only mild symptoms, that his treatment notes indicate that Mr. Shell was "doing well and was maintaining well and stable on medication," and that the record as a whole indicates only mild to moderate impairments overall. (AR 49). Mr. Shell objects on several grounds to the weight given to Dr. Varma's opinion.

First, Mr. Shell argues that "stable" does not mean "not disabled." Although the ALJ does not identify the records to support that Mr. Shell was "doing well and was maintaining well and

stable on medication," the Commissioner cites pages 794, 813, and 849 of the record for this holding. Pages 794 and 813 are duplicates for the service date of May 20, 2009, which was performed by Karen Lothamer, and page 849 is for the service date of September 21, 2009, performed by Dr. Varma. On both service dates, the treatment notes, which are made on a check box form, have the box "maintaining well and stable" checked. *See* (AR 794, 813, 849). The treatment date of February 17, 2010 also indicates "maintaining well and stable." The options under "assessment" are "no change," "maintaining well and stable," "much better," "slightly better," "symptomatic but stable," "slightly worse," "much worse," "other." *Id.*

In contrast, the treatment notes for the dates of March 30, 2009 (Ms. Lothamer), August 10, 2009 (Ms. Lothamer), and August 21, 2009 (Dr. Varma), have the box for "symptomatic but stable" checked. (AR 790, 834, 843). On December 16, 2009, the box for "much better" was checked. (AR 900).

On March 30, 2009, August 10, 2009, August 21, 2009, September 21, 2009, December 16, 2009, and February 17, 2010 the treatment notes indicate that Mr. Shell was compliant with medication. (AR 790, 794, 833, 842, 849, 890, 899). On the form for each treatment date, the box for "no problems" is checked for "memory." *See* (AR 789, 793, 832, 841, 849, 889, 898). At the end of each treatment note, the number of weeks to the next appointment was indicated, and it appears that Mr. Shell appeared for all of his appointments.

In support of his argument that the ALJ improperly relied on the statements that Mr. Shell was "stable," Mr. Shell cites *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004); *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000). In *Robinson*, a decision from the Tenth Circuit Court of Appeals, the treating doctor's reports that referenced the plaintiff as "stable" also

"contemporaneously and consistently report[ed] that [she] was unable to work as a result of her mental illness." 366 F.3d at 1083. In contrast, in this case, there are not explicit statements regarding an ability to work in the treatment notes that contain the statement that Mr. Shell was "maintaining well and stable." Nor does Mr. Shell identify other findings or notes in those treatment notes that negatively impact his ability to work. In *Morales*, a case from the Third Circuit Court of Appeals, although the doctor noted that the plaintiff was stable with medication, he also opined that the plaintiff's mental impairment rendered him markedly limited in a number of work-related activities, which was supported by other information in the treatment records. 225 F.3d at 319; *see also Bradley v. Astrue*, No. 11-CV-3, 2012 WL 4361410, *11 (N.D. Ill. Sept. 21, 2012) (discussing and distinguishing *Morales*). Like in *Morales*, Dr. Varma gave an opinion that limited Mr. Shell's ability to work (the need to miss work three or more days a month) notwithstanding treatment records that Mr. Shell was stable. Unlike in *Morales*, there are indications of greater limitations in the treatment records.

First, the "assessment" of Mr. Shell by Dr. Varma and his staff was not always "well" and "stable" but also on an equal number of occasions was indicated as "symptomatic but stable." The ALJ does not acknowledge or discuss these assessments; from reading the ALJ's decision, one would think that all of the assessments were "maintaining well and stable." Nor does the ALJ discuss the fact that, although the assessments always indicated "stable," they fluctuated between being accompanied by the additional assessment of "maintaining well" and "symptomatic." The ALJ does not discuss what it means to be "symptomatic," how that would affect Mr. Shell's ability to work, or how those assessments do or do not support Dr. Varma's April 22, 2010 opinion that Mr. Shell would have to miss three or more days of work a month. The ALJ should have discussed this

favorable evidence in weighing Dr. Varma's opinion. *See Scott*, 647 F.3d 734, 739-40 (7th Cir. 2011) (finding that the ALJ was too quick to read an inconsistency between the doctor finding that the claimant was markedly limited in her ability to enter the workforce and the doctor stating that the claimant had responded well to treatment because the treatment notes indicated ongoing symptoms; stating that the ALJ is not permitted to "cherry-pick" from mixed results to support a denial of benefits; and that the ALJ's analysis "reveals an all-too-common misunderstanding of mental illness" that a single notation that a patient is feeling better means that the condition has been treated (citing *Punzio*, 630 F.3d at 710; *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008))); *see also Hunt v. Astrue*, 889 F. Supp. 2d 1129, 1144 (E.D. Wis. 2012) (holding that it is not appropriate to assume that a person characterized as "stable" is able to work (citing *Hemminger v. Astrue*, 590 F. Supp. 2d 1073, 1081 (W.D. Wis. 2008) (stating that "a person can have a condition that is both 'stable' and disabling at the same time"); *Lechner v. Barnhart*, 321 F. Supp. 2d 1015, 1030 (E.D. Wis. 2004) ("One can be stable and yet disabled."))).

Second, the ALJ's failure to acknowledge, much less discuss, the GAF of 45 given by Dr. Varma in the opinion and two other GAF scores of 50 in the record undermines the weight he gave to Dr. Varma's opinion. In his decision, the ALJ finds that Mr. Shell's "GAF score was in the 55-61 range consistently." (AR 49). In support, the ALJ cites only the September 8, 2009 treatment plan by Mr. Liechty with Dr. Varma's staff, which indicated a GAF of 61. An earlier August 24, 2009 treatment plan from Dr. Varma's office also indicated a GAF of 61. None of the routine treatment notes from Dr. Varma's office contain a GAF score. However, in the April 22, 2010 opinion, Dr. Varma assigned Mr. Shell a GAF of 45. On May 13, 2009, Mr. White and Mr. Lambertson from Dr. Varma's office assigned a GAF of 50. *See* AR 546. On June 29, 2009, the state agency consultative

psychiatrist, Dr. Huang, assigned a GAF of 50. Although an ALJ is not required to base the determination of an individual's disability entirely on a GAF score, *see Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010), the scores are one more piece of relevant evidence that the ALJ should have considered in weighing Dr. Varma's opinion. This is especially true here because the ALJ based the weight in part on the opinion being "inconsistent with the record as a whole." (AR 50).

Similarly, the ALJ does not discuss the statements in the "Report of Psychiatric Status" authored by Mr. White and Dr. Lambertson on May 13, 2009, which describes Mr. Shell speaking with "utter despair" and his report that he would alienate himself from family and others. *See* (AR 548). While it is true that this evaluation was conducted within two months of his traumatic leg injury, the ALJ does not discuss the report or provide any explanation for discounting it, if he in fact considered it. It is also true that the ALJ need not discuss every piece of evidence. Yet, when the ALJ gives less weight to a treating psychiatrist on the basis that the record shows only mild to moderate symptoms, the failure to discuss contradictory error requires remand.

In addition to the ALJ's failure to discuss this relevant evidence, an ALJ that does not give a treating physician's opinion controlling weight must consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion. *Scott*, 647 F.3d 734, 740 (7th Cir. 2011) (citing *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2))). First, Dr. Varma and Park Center have a long and extended treatment relationship with Mr. Shell, treating him on a regular basis (approximately every two to three months) for over a year for both pharmacological management as well as insight therapy. Second, Dr. Varma is a psychiatrist and not a psychologist. Nothing in the decision suggests that the ALJ considered either

of these factors. Even if the ALJ was aware of the fact that Dr. Varma is a psychiatrist, the ALJ does not discuss how the factor affected the weight given to the opinion. Finally, although the ALJ did consider the factor of internal consistency, as noted above there are several factual considerations omitted by the ALJ that bring that finding into question.

Mr. Shell is not asking the Court to reweigh the evidence but rather to require the ALJ to properly evaluate the opinion under the regulations. Based on the foregoing, the Court finds that the weight given to Dr. Varma's April 22, 2010 opinion is not supported by substantial evidence. Given that Mr. Shell would have been found disabled had Dr. Varma's opinion been given controlling weight, remand for a proper determination by the ALJ is required.

2.    *Dr. Huang–Consultative Examiner*

Dr. Huang is a clinical psychologist who performed a consultative examination of Mr. Shell on June 29, 2009. Dr. Huang opined that Mr. Shell has significant memory problems that would likely interfere with "adequate vocational functioning." (AR 633). She also found that he had a Major Depressive Disorder that was severe, that he would have difficulty remembering information that was presented earlier, and that he was dependent on his grandfather to remind him to go to doctor's appointments. The ALJ gave Dr. Huang's opinion little weight "because it is contradicted by other evidence in the record." (AR 50). Specifically, the ALJ indicated that the activities of daily living report regarding memory and concentration given by Mr. Shell's grandfather to the State Agency employee on July 2, 2009, is not consistent with severe difficulties indicated by Dr. Huang's memory scores. The ALJ also reasoned that there are no available medical records to support severe memory deficits. Dr. Huang assigned a GAF of 50; as noted above, the ALJ did not mention or discuss the score.

First, although the ALJ does not discuss the specifics of the grandfather's conversation, the ALJ is correct that the grandfather's statements during the June 2, 2009 phone call suggest that Mr. Shell does not have memory problems. When asked, the grandfather could not think of any memory problems that Mr. Shell might have with regard to his activities of daily living. When asked if Mr. Shell had difficulty remembering things while cooking, such as forgetting something on the stove, the grandfather responded that the only difficulty with cooking was standing too long. When asked if Mr. Shell has problems remembering his doctor appointments, the grandfather reported that Mr. Shell's only difficulty was putting the wrong date for the appointment in his phone's calendar. The grandfather also reported that Mr. Shell is able to remember faces, names, and familiar places and that Mr. Shell would not get lost if he were driving. The grandfather reported that Mr. Shell was planning to go back to Ivy Tech that fall.

However, the ALJ did not acknowledge or discuss the grandfather's contradictory statements given in writing a few months later on July 30, 2009. Therein, the grandfather indicated that Mr. Shell has problems with memory, completing tasks, concentration, understanding, following instructions, and getting along with others. (AR 260). He also reported that Mr. Shell is not able to follow spoken instructions well or able to handle stress or changes in routine well. The grandfather also wrote that Mr. Shell has problems with his short term memory, describing it as "very poor," and that he cannot work due to his mental depression. (AR 262). Again, the ALJ may not "cherry-pick" the evidence that supports a denial of benefits while ignoring favorable evidence that either supports an award of benefits or appears to contradict the basis on which the ALJ's decision lies. *See Scott*, 647 F.3d at 740 (citing *Denton*, 596 F.3d at 425; *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)). The Commissioner accuses Mr. Shell of failing to explain the change in his grandfather's allegations

in his brief. Nevertheless, the ALJ's decision is deficient because he considered only the favorable evidence without evaluating the unfavorable. In addition, Mr. Shell notes that, at the hearing, when his mother was asked by his attorney about the discrepancies in the grandfather's reports, she testified that he was ill himself. No follow-up questions were asked.

Second, as to the ALJ's statement that there are no "medical records" to support severe memory deficits, it appears that the ALJ may have been looking for objective tests or evidence of brain injury. However, as noted in the previous section, the ALJ does not discuss the findings in the May 13, 2009 "Report of Psychiatric Status" authored by Mr. White and Dr. Lambertson, which indicates that Mr. Shell has significant problems with memory. He had problems with the digit span testing and remembering objects that he was told to remember. Mr. Shell self-reported his memory problems, stating that, until the time of his accident in February 2009, he did not have problems with short-term memory but that "he definitely has difficulty with his short-term memory with regard to remembering things that were just told to him." (AR 548). Mr. White and Dr. Lambertson reported that "due to [Mr. Shell's] poor lack of concentration and short-term memory, it would be very difficult for him to even concentrate on any menial task for at least a year or so, and possibly his lifetime." (AR 552). They also found that "[d]ue to Mr. Shell's inability to concentrate and having problems with his short-term memory, it would be difficult for him at this particular time to even conceive the fact that he could be working." *Id*. Also curious is the ALJ's reliance on Dr. Hill's opinion, yet Dr. Hill listed Mr. Shell as having a medically determinable impairment of "amnesic [disorder] due to brain trauma." (AR 661). On remand, the ALJ is directed to consider all of the grandfather's statements and the May 13, 2009 report as he weighs the opinion of Dr. Huang.

3.    *Dr. Norton–Treating Physician*

The ALJ gave great weight to Dr. Norton's opinion because he was Mr. Shell's treating physician and his records are consistent with the record as a whole. The ALJ noted that Dr. Norton treated Mr. Shell for his lower extremity problems from March 2009 to April 2010. The ALJ indicated that Dr. Norton's records report that Mr. Shell was healing normally after his procedures and the swelling was normal. Dr. Norton opined that Mr. Shell would be able to perform a desk job, which the ALJ translated into the ability to do sedentary work.

However, on July 10, 2009, Dr. Norton issued discharge instructions providing that Mr. Shell was able to return to work that same date for desk work only and that he must elevate his feet 10-15 minutes for every two hours of work. When asked at the hearing about this opinion, the VE testified that this kind of limitation would eliminate sedentary work. The Commissioner is correct that these instructions were issued two weeks after Mr. Shell underwent amputation of a toe. However, the ALJ neither mentions nor discusses this favorable evidence; the ALJ does not address why this opinion from Dr. Norton does not further limit Mr. Shell's RFC. It was an error not to have included this report given that the ALJ gave Dr. Norton controlling weight.

The Commissioner attempts to downplay the meaning of Dr. Norton's limitation to elevating the leg by pointing out that, two weeks later, Dr. Berning stated that Mr. Shell had "no functional limitations in reference to his feet" (AR 745). The Commissioner notes that the ALJ mistakenly attributed this statement to Dr. Norton, which perhaps may explain why the ALJ did not discuss the earlier note. Regardless, the ALJ did not discuss the note, and the attribution of Dr. Berning's note to Dr. Norton only further reinforces the need for the ALJ to consider all of Dr. Norton's opinion.

Finally, Dr. Hedrick, as discussed in the next section, found a year later in June 2010 that Mr. Shell needed to elevate his leg, and the ALJ did not discuss that opinion either. Although the ALJ may ultimately find that Mr. Shell is not entitled to benefits after a proper analysis, it cannot be said that the result on remand is certain. *See Roddy*, 705 F.3d at 637 ("But the Commissioner cannot defend the ALJ's decision using this rationale directly, or by invoking an overly broad conception of harmless error, because the ALJ did not employ the rationale in his opinion." (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943); *Martinez v. Astrue*, 630 F.3d 693, 694 (7th Cir. 2011))).

4.      *Dr. Hedrick–Treating Physician*

On June 3, 2010, Dr. Hedrick provided a Medical Source Statement on which he indicated that Mr. Shell's prognosis is "poor." (AR 996). Dr. Hedrick described the nature of Mr. Shell's pain and stated that it was constant. He indicated that elevation and rest are helpful. In the opinion, Dr. Hedrick circled "More than 2" hours for the hours that Mr. Shell can sit at one time before needing to get up. He circled "15" for the number of minutes that Mr. Shell can continuously stand. Dr. Hedrick then checked "less than 2 hours" for how long Mr. Shell can sit as well as for how long he can stand/walk total in an 8-hour working day with normal breaks. Dr. Hedrick opined that Mr. Shell was not capable of working an 8-hour work day, 40 hours a week. He opined that Mr. Shell would need a job that permits shifting positions at will from sitting, standing, or walking. He also opined that Mr. Shell would need to take unscheduled breaks for pain, fatigue, and medication side effects. Dr. Hedrick indicated that Mr. Shell needs to elevate his leg above the heart with prolonged sitting because of swelling. Finally, Dr. Hedrick indicated that Mr. Shell would likely be absent from work more than three days a month. Again, the VE testified that someone who missed work three or more

days a month would not be able to work and that an individual who would have to elevate his leg above heart level 12% of the day would not be able to perform competitive work.

The ALJ gave this opinion little weight for three reasons. First, the ALJ found it internally inconsistent because Dr. Hedrick found that Mr. Shell could sit for more than two hours at a time but also that he could only sit for less than two hours total in an 8-hour work day. On their face, these two check box opinions are inconsistent. In light of the consistency of the remainder of the opinion, the Court wonders whether Dr. Hedrick made an error either of selection or apprehension in reading and responding to those two questions.

Second, the ALJ found the opinion inconsistent with Dr. Hedrick's treatment notes, reasoning that Dr. Hedrick's treatment notes consistently describe Mr. Shell as pleasant and in no apparent distress, which the ALJ found to be inconsistent with the opinion that Mr. Shell would be absent more than three days a week and is not capable of work an eight-hour day, forty hours a week. Mr. Shell asserts that statements about being "pleasant and in no apparent distress" are "harmless observations" made in the doctor's office and are not a statement about his medical limitations. Pl. Br., p. 22. The Court notes that, although those statements are made under the heading "constitutional" under "physical examination," Dr. Hedrick fully summarized Mr. Shell's statements regarding his severe pain (8 on a scale of 1 to 10), diagnosed him with neuropathic pain, and prescribed medication for the pain, increasing his dosage. (AR 738). Moreover, in the June 2010 opinion, Dr. Hedrick indicated that Mr. Shell is not a malingerer. The ALJ erred in pulling the phrase "pleasant and in no apparent distress" from the treatment note on July 22, 2009 without further discussing the remainder of the note.

Third, the ALJ found Dr. Hedrick's opinion inconsistent with Dr. Norton's opinion that Mr. Shell could perform a desk job. This is accurate; the opinions are inconsistent in this regard. However, they are not inconsistent with regard to the need to elevate the leg a portion of the day. The ALJ does not discuss these opinions, and, if they were credited, Mr. Shell would be found disabled in light of the VE's testimony. It is not clear whether the ALJ found Dr. Hedrick's opinion inconsistent with that of Dr. Norton because he mistakenly attributed the opinion of Dr. Berning that Mr. Shell essentially had no work restrictions to Dr. Norton. If so, then this basis for discounting Dr. Hedrick's opinion is not valid.

Finally, as with Dr. Varma, the ALJ did not discuss the "checklist factors" that Dr. Hedrick is a pain specialist and that he had a treating relationship with Mr. Shell. On remand, the ALJ shall address the requirement by Dr. Norton and Dr. Hedrick that Mr. Shell must elevate his leg during the work day, shall fully consider the treatment records of Dr. Hedrick when evaluating whether they are inconsistent with his opinion, and shall reconsider whether Dr. Hedrick and Dr. Norton's opinions are inconsistent given that the July 2009 opinion of Dr. Berning was mistakenly attributed to Dr. Norton.

## B. Limitations in Concentration, Persistence, or Pace

Mr. Shell argues that the ALJ erred by failing to properly incorporate his finding at step three of a moderate degree of limitation in concentration, persistence, or pace into his hypothetical to the VE at step five. Mr. Shell notes that the only limitation in the hypothetical that might relate to a mental limitation is the limitation to "unskilled" work. Although Mr. Shell couches this argument in terms of the sufficiency of the hypothetical posed to the ALJ, the Court notes that the nonexertional limitation to "unskilled" work was included by the ALJ in the RFC, which was in turn

included in the hypothetical to the VE. Thus, Mr. Shell's argument is in fact that the limitation to "unskilled" work in the RFC itself does not properly reflect his moderate difficulties in concentration, persistence, or pace. *See* (AR 44).

The Seventh Circuit Court of Appeals has held that, in most cases, moderate limitations in concentration, persistence, or pace are not adequately considered by limitations to simple, routine, or unskilled work, with a few exceptions. *See O'Connor-Spinner*, 627 F.3d at 620-21 ("In most cases . . . employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace." (citing *Stewart v. Astrue*, 561 F.3d 679,684 (7th Cir. 2009); *Craft*, 539 F.3d at 677-78; *Ramirez v. Barnhart*, 372F.3d 546, 554 (3d Cir. 2004); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003))). The court reasoned that "[t]he ability to stick with a task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." *Id.* Nevertheless, one of the exceptions is when the ALJ's phrasing "specifically excluded those tasks that someone with the claimant's limitations would be unable to perform." *O'Connor*, 627 F.3d at 619 (explaining that, at that time, those cases were most often ones in which the claimant's limitations were stress- or panic-related (citing *Johnson v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002)); *see also Bisel v. Astrue*, 1:11-CV-221, 2012 WL 2921645, at *9-10 (N.D. Ind. July 17, 2012) (applying the exception to a limitation in the RFC to unskilled work); *Allbritten v. Astrue*, 2:11-CV-116, 2012 WL 243566, at *7 (N.D. Ind. Jan. 25, 2012) (applying the exception to a limitation to simple, unskilled work).

Mr. Shell is correct that, at step three, using the special technique, the ALJ found that Mr. Shell had moderate difficulties with concentration, persistence, or pace based on a difficulty with

following spoken instructions because he forgets them frequently. The ALJ noted that Mr. Shell's mother reported that Mr. Shell has trouble with his short-term memory. The ALJ acknowledged the April 4, 2009 statement by Mr. Shell that he can pay attention "as long as needed" and his statement on July 23, 2009, that he has no problems with concentration. Finally, the ALJ recognized that Dr. Hill, the consultative reviewer, indicated moderate difficulties in maintaining concentration, persistence, or pace. A review of the boxes checked by Dr. Hill on the Mental Residual Functional Capacity Assessment form ("MRFC Assessment") dated July 3, 2009, show that she found Mr. Shell moderately limited in three subcategories: the ability to understand and remember detailed instructions, to carry out detailed instructions, and to maintain attention and concentration for extended periods.

After finding that Mr. Shell did not meet a listing at step three, the ALJ continued on to determine Mr. Shell's RFC. In that analysis, the ALJ found that the record does not support severe memory problems in large part because of the remainder of Dr. Hill's MRFC Assessment, giving little weight to Dr. Huang's favorable opinion and the memory scores for the reasons set forth in the preceding section. The Court notes that both of the reasons the ALJ gave for discounting Dr. Huang (that the grandfather's description of memory problems was not consistent with severe difficulties and that there are no available medical records to support memory deficits) were also made by Dr. Hill in her MRFC Assessment. *See* (AR 677).

In giving great weight to the opinion of Dr. Hill, the ALJ relied on the concluding opinion of Dr. Hill's MRFC Assessment, which is that, "[w]hile it is expected that [Mr. Shell] would be unable to complete complex tasks, [he] would be able to complete repetitive tasks on a sustained basis without special considerations." (AR 677). Thus, Dr. Hill's opinion supports the ALJ's

addition to the RFC for sedentary work the limitation to "unskilled work" to account for Mr. Shell's limitations in concentration, persistence, and pace. *See Griggs v. Astrue*, No. 1:12-CV-56, 2013 WL 1976078, at *11 (N.D. Ind. May 13, 2013) (finding that the State agency reviewer essentially "translated [his] findings into a specific RFC assessment" (citing *Johnson*, 314 F.3d at 288-89); *cf. Delgado v. Colvin*, 3:12-CV-53 JVB, 2013 WL 2431160, *15 (N.D. Ind. June 4, 2013) (holding that the ALJ's limitation to simple, routine work did not sufficiently address the plaintiff's moderate limitations in her ability to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods).

Mr. Shell cites *Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011), for the holding that a limitation to "unskilled work" in a hypothetical was not consistent with the opinion of the State agency psychologist. *See* Pl. Br., p. 17. *Jelinek* is distinguishable because the state agency psychologist in that case found that the plaintiff was also limited in the ability to maintain regular work attendance, to carry out instructions, and to deal with the stresses of full-time employment. In light of Dr. Hill's opinion that Mr. Shell would be able to complete repetitive tasks on a sustained basis without special considerations, *Jelinek* appears not to be controlling. *See, e.g.*, *Griggs*, 2013 WL 1976078, at *10-11 (finding that the ALJ accounted for the deficiencies in concentration, persistence, and pace by the limitation in the RFC to "a range of unskilled to low-end, semi-skilled work involving no rapid or frequent changes in work routine and only incidental contact with the public").

However, in light of the errors the ALJ made in weighing the opinions of certain physicians, as discussed in the previous section, including the failure to consider several GAFs of 50 or lower, it is not clear that substantial evidence supports the weight given by the ALJ to Dr. Hill's opinion,

which the ALJ translated into the limitation to "unskilled" work. In other, words, the incorporation of Dr. Hill's opinion that Mr. Shell would be able to complete repetitive tasks on a sustained basis without special considerations into the RFC as "unskilled" work, may not sufficiently account for Mr. Shell's limitations in concentration, persistence, and pace. *See Jelinek*, 662 F.3d at 812 (finding that the ALJ improperly weighed the specific opinions of a treating doctor, in part, because of a GAF score of 50 given by an examining consultant, and, thus, the ALJ did not properly consider the opinion in formulating the RFC or the hypotheticals).

As for the three GAF scores of 50, 50 and 45 that the ALJ did not discuss in favor of stating that Mr. Shell's "GAF score was in the 55-61 range consistently," (AR 49), the notations that accompany some of the scores shed light on Mr. Shell's memory and concentration difficulties, which brings into question whether the limitation to "unskilled" work accounts for his moderate difficulties in sustaining work. *See Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010) (holding that the ALJ had selectively discussed portions of a physician's report but failed, among other things, to discuss a GAF score of 50).

On May 13, 2009, Dr. Lambertson and Mr. White assigned Mr. Shell a GAF of 50. *See* (AR 546). In the comments in the section titled "Sensorium and Mental Capacity" of the report, Mr. Shell reported that, since the accident in February 2009, he "definitely has difficulty with his short-term memory with regard to remembering things that were just told to him." (AR 549). As an example, Mr. Shell said that it was difficult for him to repeat the random digits forward and backward that had been asked by the examiner. As set forth in the previous section, Dr. Lambertson opined that "due to the client's poor lack of concentration and short-term memory, it would be very difficult for him to even concentrate on any menial task for at least a year or so, and possibly his lifetime." (AR 552).

On June 29, 2009, Dr. Huang assigned a GAF of 50. In her narrative assessment, Dr. Huang found that Mr. Shell suffered from significant immediate and short term memory problems that would "interfere with adequate vocational functioning" because he "would have difficulty remembering information that was presented earlier." (AR 633). Dr. Huang did not opine on Mr. Shell's concentration, persistence, or pace. The third favorable GAF was 45, assigned by Dr. Varma in the April 22, 2010 Mental Impairment Questionnaire; Dr. Varma does not offer any narrative explanation for his opinions.

The Court further notes that the August 24, 2009 treatment plan and the September 8, 2009 treatment plan from Park Center Inc. each indicate that one of Mr. Shell's "problems" is that Mr. Shell needs assistance with medical appointments and/or taking medications as prescribed. *See* (AR 854, 923).

Thus, had the ALJ properly addressed the relevant evidence when assigning weight to the various physicians, the ALJ's reliance on Dr. Hill's opinion to translate the moderate limitations in concentration, persistence, and pace into an RFC for "unskilled" work likely would have been sufficient. However, because of the errors set forth above, the Court cannot say that substantial evidence supports the ALJ's hypothetical posed to the VE, which was based on that RFC, to the extent it may not properly account for Mr. Shell's deficiencies in maintaining concentration, persistence, or pace.

## C. Credibility

Finally, Mr. Shell argues that the ALJ improperly evaluated his credibility. In making a disability determination, Social Security Regulations provide that the Commissioner must consider a claimant's statements about his symptoms, such as pain, and how the claimant's symptoms affect

his daily life and ability to work.  *See* 20 C.F.R. §§ 404.1529(a); 416.929(a).  However, subjective allegations of disabling symptoms alone cannot support a finding of disability. *See id*. In determining whether statements of pain contribute to a finding of disability, the Regulations set forth a two-part test: (1) the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the alleged symptoms; and (2) once an ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms. *Id*.

The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)     The individual's daily activities;
(2)     Location, duration, frequency, and intensity of pain or other symptoms;
(3)     Precipitating and aggravating factors;
(4)     Type, dosage, effectiveness, and side effects of any medication;
(5)     Treatment, other than medication, for relief of pain or other symptoms;
(6)     Other measures taken to relieve pain or other symptoms;
(7)     Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  In making a credibility determination, Social Security Ruling 96-7p provides that the ALJ must consider the record as a whole, including objective medical evidence, the claimant's statement about symptoms, any statements or other information provided by treating or examining physicians and other persons about the conditions and how the conditions affect the claimant, and any other relevant evidence.  *See* SSR 96-7p, 1996 WL 374186 (Jul. 2, 1996); *see also* §§ 404.1529(c)(1); 416.929(c)(1).

An ALJ is not required to give full credit to every statement of pain made by the claimant or to find a disability each time a claimant states he is unable to work. *See Rucker v. Chater*, 92 F.3d

492, 496 (7th Cir. 1996). However, Ruling 96-7p provides that a claimant's statements regarding symptoms or the effect of symptoms on his ability to work "may not be disregarded solely because they are not substantiated by objective evidence." SSR 96-7p at *6. "Because the ALJ is 'in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (quoting *Skarbek*, 390 F.3d at 504-05); *see also Prochaska*, 454 F.3d at 738.

In his Opening Brief, Mr. Shell acknowledges that the ALJ gave the following specific reasons for finding him not fully credible: there was no medical evidence that shows that he was unable to perform work-related activities, he had a sporadic work history, he applied for unemployment, his daily activities were not limited to the extent that one would expect for an individual to be disabled, his psychological tests consist only of moderate symptoms, he was not compliant with treatment, and his GAFs were not consistent with his complaints. The ALJ made several errors in these assessments. On remand, the ALJ is directed to reevaluate Mr. Shell's credibility with the following guidelines.

First, to the extent that the ALJ will be reweighing the opinions of the various physicians and considering the evidence set forth in the previous sections, the ALJ should reconsider the statement that there was no medical evidence to show that Mr. Shell was unable to perform work-related activities.

Second, Mr. Shell argues that the ALJ does not explain what he means by a "sporadic work history," contending that he did have regular employment, even though his earnings were low. He also asserts that some of the breaks or dips in earnings were due to problems that he had with depression and anxiety, citing generally Section D ("Remarks") of the "Function Report- Adult-

Third Party" submitted by his mother on April 5, 2009. *See* AR 206. On remand, the ALJ is to explain what he means by "sporadic work history" and to consider whether dips in earnings were impacted by Mr. Shell's depression and anxiety before discounting his credibility on this basis.

Third, it appears that the ALJ erred in taking into account that Mr. Shell was receiving unemployment compensation. "It is not inappropriate to consider a claimant's unemployment income in a credibility determination." *Miocic v. Astrue*, 890 F. Supp. 2d 1046, 1059 (N.D. Ill. 2012) (citing *Schmidt*, 395 F.3d at 745-46). In *Schmidt*, the Seventh Circuit Court of Appeals explains:

> [W]hile we have previously held that "employment is not proof positive of ability to work," *Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir. 1998), we are not convinced that a Social Security claimant's decision to apply for unemployment benefits and represent to state authorities and prospective employers that he is able and willing to work should play absolutely *no* role in assessing his subjective complaints of disability.

395 F.3d at 746. However, Mr. Shell applied for unemployment benefits *before* his alleged onset date and was receiving them at the time he was hospitalized at his onset date. Thus, it appears that the ALJ erred in finding that Mr. Shell was suffering from his alleged disability at the time he *filed* for unemployment benefits. The ALJ did not inquire whether Mr. Shell continued to receive unemployment benefits after he was hospitalized. The ALJ shall reconsider this factor on remand.

Fourth, Mr. Shell argues that there was sufficient evidence that his daily activities were limited to the point that he would be unable to work. Mr. Shell notes that the May 13, 2009 Report of Psychiatric Status completed by Mr. White and Dr. Lambertson indicates that Mr. Shell isolated himself and that his main activities were going to the doctor's office and physical therapy. Mr. Shell also notes generally his grandfather's description of Mr. Shell's daily activities, which he asserts indicates that he is unable to sustain work. Finally, Mr. Shell notes generally his own report on daily living activities, citing the Function Report - Adult, dated April 8, 2009, in which he describes his

activities of daily living as eating, taking medication, changing the dressing on his leg, going to physical therapy, going to the doctor (neurologist, plastic surgeon, psychiatrist), trying to walk, resting, eating, going to bed. On remand, the ALJ is to consider these factors in assessing activities of daily living.

Fifth, Mr. Shell argues generally that the psychological testing and evidence indicate that he has more than moderate symptoms. He does not specifically identify any evidence in support of this statement. This argument is unpersuasive to the extent it has not already been addressed by the Court.

Sixth, regarding his noncompliance, Mr. Shell argues that, under SSR 96-7p, the ALJ was required to inquire into the circumstances of the noncompliance to find what, if any, reasons there are for the noncompliance. Mr. Shell asserts that the ALJ never inquired into his compliance at the hearing. Moreover, Mr. Shell's memory problems may be an explanation for his noncompliance that the ALJ did not explore. Mr. Shell is correct that the ALJ's reference to a treatment note on December 27, 2008, that Mr. Shell was not taking medications is not adequately explained by the ALJ because that treatment note is from the date that Mr. Shell was hospitalized for his suicide attempt. The treatment note on that date indicates that he was uncooperative and irritable, not taking his medications, and "? suicidal". AR 960. Shortly after that time, his family had him committed.

On remand, the ALJ should reconsider these factors when assessing Mr. Shell's credibility.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the Opening Brief of Plaintiff in Social Security Appeal [DE 21] and **REMANDS** this case for further proceedings consistent with this Opinion and Order.

So ORDERED this 16th day of September, 2013.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record